## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

P. H. GLATFELTER COMPANY,
96 South George Street, Suite 500
York, Pennsylvania 17401,

                   Plaintiff,

    v.

BABCOCK & WILCOX POWER
GENERATION GROUP, INC., f/k/a THE
BABCOCK & WILCOX COMPANY, n/k/a
BABCOCK & WILCOX ENTERPRISES, INC.
20 South Van Buren Avenue
Barberton, Ohio 44203,

                   Defendant.

Civil Action No:

## COMPLAINT

Plaintiff P. H. Glatfelter Company ("Glatfelter"), by its undersigned counsel, files this Complaint against Defendant Babcock & Wilcox Power Generation Group, Inc., formerly known as The Babcock & Wilcox Company, and now known as Babcock & Wilcox Enterprises, Inc. ("Babcock"), and avers as follows:

## PRELIMINARY STATEMENT

1.    Glatfelter, a global supplier of engineered materials headquartered in York, Pennsylvania, previously owned a paper mill in Spring Grove, Pennsylvania. The paper mill used three boiler systems that created steam to generate electricity for sale and internal use, and to power the mill's pulping and paper-making

equipment. To meet new federal environmental standards for clean emissions set in 2013, Glatfelter undertook to replace its century-old coal-fired boilers with two new natural gas-powered boilers. The project was massive—costing Glatfelter tens of millions of dollars—and it was required to be completed by January 27, 2017, the EPA deadline to meet the new environmental standards and to shut down the existing coal-fired boilers.

2.      To find the right boiler contractor, Glatfelter created a detailed specification for the new natural gas boilers and put it out for bid. In response, Glatfelter received a proposal from Babcock, a well-known and experienced boiler fabricator. Babcock told Glatfelter that it had fabricated boilers precisely like those Glatfelter was requesting, and would have no problem meeting Glatfelter's specifications within the designated deadlines and within the building footprint dimensions provided. Based on Babcock's promises, Glatfelter entered into a contract with Babcock to design and fabricate the new natural gas boilers in exchange for payment of over $11 million.

3.      Babcock proceeded to miss nearly every deadline in the contract, delaying the project for years, and causing Glatfelter to incur significant damages. Furthermore, Babcock defectively designed the boilers, so that they were too large and could not fit (with required auxiliary equipment) in the three-story building designed to house them. This required demolition of some of the work that had

already begun and extensive modifications to the building, to add three mezzanines and two penthouses and an out-building for chemical storage, plus other major expenses—all to accommodate Babcock's defective work.

4.     Among other things, Glatfelter had to increase the size of the boiler facility, re-order custom steel for the new boiler facility, pay mechanical and electrical contractors to work overtime and with larger crews (so that work that should have taken six months to complete now would be completed within a condensed three months), and incur costs relating to all of these changes in scope and schedule, including increased rental equipment costs and other materials.

5.     Eventually, Babcock admitted to Glatfelter that it was not even building the boilers itself—it had closed its Mississippi factory and was subcontracting substantial portions of the construction for the major components for both boilers to several outside "vendors." Glatfelter had selected Babcock as its boiler fabricator because of its reputation, deep experience and expertise—not some unknown subcontractors. Moreover, Babcock had known it was closing the Mississippi plant, and that it would not be finishing the boilers itself—yet never told Glatfelter, and instead fraudulently misrepresented to Glatfelter that it would be fabricating the boilers itself completely at its Mississippi facility, in order to get the contract.

6.     Once Babcock finally delivered the boilers and turned them on, many additional design defects and performance flaws became clear.  For example, the

steam output was defective—it was too hot and full of particulate matter, which would damage Glatfelter's steam turbines. The boilers began to crack and melt the interior insulation, causing the exterior of the boiler to become hot. This excessive heat presents an unsafe condition to operators as well as a loss in boiler efficiency and potential to cause premature boiler tube failure. Glatfelter raised these issues, among many others, to Babcock in numerous meetings and boiler inspections. Although Glatfelter gave Babcock many opportunities to cure the numerous defects in the new boilers, Babcock failed to remediate the major issues or deliver the boilers that Glatfelter specified.

7.      Glatfelter expended tens of millions of dollars trying to address and react to Babcock's failures to deliver the boilers as specified and to satisfactorily correct Babcock's many design and construction defects. Glatfelter comes before this Court asserting claims for breach of contract, fraud, negligent misrepresentation, promissory estoppel and unjust enrichment, seeking fair compensation for its significant losses.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Glatfelter is a Pennsylvania corporation with a principal place of business located at 96 S. George Street, Suite 500, York, Pennsylvania 17401.

9.      Defendant Babcock is a Delaware corporation with a principal place of business located at 900 B&W Drive, West Point, Mississippi 39773; 13024

4

Ballantyne Corporate Place, Suite 700, Charlotte, North Carolina 28277; or 20 South

Van Buren Avenue, Barberton, Ohio 44203.

10.    This Court has jurisdiction over this matter based on diversity of

citizenship under 28 U.S.C. §1332, in that the amount in controversy exceeds

$75,000 and is between citizens of different states.

11.    This Court has personal jurisdiction over Babcock because Babcock

delivered the boilers and related products to Glatfelter's business located in York

County, Pennsylvania, and further performed services for Glatfelter in this district.

12.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part

of the events giving rise to Glatfelter's claims occurred in this judicial district, and

because Glatfelter and Babcock contractually agreed to litigate in this Court ("Any

litigation arising hereunder or related hereto must be brought before either the York

County, Pennsylvania Court of Common Pleas or the United States District Court

for the Middle District of Pennsylvania").

## BACKGROUND

### A.    Glatfelter's Business and the Spring Grove Paper Mill.

13.    Glatfelter is a global supplier of engineered materials, with operations

in North America, Europe, and Asia. Glatfelter's corporate headquarters is in York,

Pennsylvania, and it previously owned a paper mill located in Spring Grove,

Pennsylvania (the "Mill")—the same small town where Glatfelter was founded over 150 years ago.

14.    The Mill is a landmark for papermaking, comprised of both historic and state-of-the-art buildings, complex milling and papermaking equipment, various transportation systems, raw material storage and processing, and two dams that control the flow of water for use at the Mill.

15.    The Mill generates its own operating power, through the use of three interconnected boiler systems generating steam—a vital ingredient for papermaking that powers the Mill's paper-making equipment. Excess power generated at the Mill is sold to third parties in the regional power grid including through an on-demand agreement, which contains substantial penalties for any inability to provide power at peak demand periods.

16.    The Mill has typically produced approximately 325,000 tons of paper annually for a variety of applications, such as book publishing, envelopes, high-speed inkjet printing products, office specialty products, greeting cards, and packaging. Glatfelter also manufactures specialty products paper for nonwoven wallcoverings, composite laminates used in flooring and countertops, first-aid materials, hygiene and personal care products, cleaning supplies, metallized papers and films, tea bags and coffee filters, and many other applications.

**B.**     **Glatfelter's Project to Comply with EPA Regulations at the Mill.**

17.     In 2013, the EPA promulgated regulations entitled "Compliance for Industrial, Commercial, and Institutional Area Source Boilers" that were aimed at reducing air emissions at industrial facilities. In addition, the EPA issued other regulations directly applicable to boiler replacement projects, entitled Best Available Retrofit Technology ("BART") and Boiler Maximum Achievable Control Technology ("BMACT").

18.     Companies that were making changes at their industrial facilities to meet these regulations had to meet an EPA compliance deadline of January 27, 2017 (the "EPA Deadline").

19.     To comply with these new regulations, Glatfelter was required to discontinue using its three older coal-fired boilers.

20.     Glatfelter began to investigate how best to meet the new environmental standards and identified alternative boilers that operated on a natural gas fuel source. Glatfelter ultimately concluded that new construction and infrastructure would be required for the new boiler system and designed a master plan, which Glatfelter referred to as its BMACT Project (the "Project").

21.     The Project included design, demolition, and construction phases.

22.    Under Glatfelter's master plan, it would first need to demolish and remove an old building that housed two boilers Glatfelter had abandoned and no longer used—without interfering with existing systems and buildings.

23.    Glatfelter would need to identify a source for natural gas, and design and install a pipeline for natural gas. Glatfelter would need to also construct a new boiler facility to house two natural gas-fired boilers and related equipment, including control systems, water purification systems, and miles of piping.

24.    Glatfelter created a detailed specification for the components involved, including the boilers, available footprint, and required output. This new steam-generating system would need to be connected to the electrical turbines and papermaking equipment systems of the Mill.

25.    Glatfelter sought out an expert in boiler manufacturing for the project, and issued a Request for Proposals in September 2014 for the design, fabrication, and installation of two natural gas-powered boilers that would meet Glatfelter's specifications and could be installed under Glatfelter's schedule.

26.    Along with two other manufacturers, Babcock submitted a response to Glatfelter's RFP on October 31, 2014.  Babcock was a boiler manufacturer with over a century's experience fabricating boilers that generate steam—like the ones Glatfelter was requesting—for use in a wide variety of applications, including

nuclear facilities, submarines for the U.S. Navy, waste-to-energy, electrical generation facilities—as well as papermaking operations.

27.     In its proposal, and in subsequent discussions with Glatfelter, Babcock represented that it had significant experience in the design and fabrication of the precise types of boilers that Glatfelter was seeking, and that Babcock would fabricate Glatfelter's boilers at its facility in West Point, Mississippi. Glatfelter understood that Babcock was the industry leader with significant experience fabricating all types of boilers, including the ones specified by Glatfelter. Babcock's proposal was not the least expensive of the three; but, Glatfelter reasoned that selecting Babcock would provide Glatfelter with an experienced company capable of handling the Project and delivering it on time without any issues.

28.     Because of Babcock's purported expertise, and Babcock's express representations of its capabilities and plan to manufacture the boilers, Glatfelter selected Babcock as its boiler contractor.

### C.     The Parties' Agreement.

29.     After a lengthy negotiations period, Glatfelter and Babcock entered into a Construction Agreement dated May 15, 2015 (the "Agreement"), for the design, fabrication, and installation of the boilers.  A true and correct copy of the Agreement, with pertinent supporting Exhibits, is attached to this Complaint as Exhibit A.

30.     Under the Agreement, Babcock agreed to provide "all labor, materials, apparatus, expendable tools and equipment and all other services required for the design, fabrication, delivery, mechanical installation on [Glatfelter's] foundations, commissioning, training and startup of two (2) shop assembled or modular, package water tube boilers and auxiliary equipment." This included but was "not limited to boiler, superheater, low NOx burner, fuel trains, burner management system, FD fan, steam coil air heater, fan inlet silencer, flue gas recirculation, economizer, and interconnecting flues, ducts, and piping." *Id.*, Statement of Work, at 011000-2.

31.     Babcock also agreed to be responsible for ascertaining and verifying the field conditions and dimensions; delivering, unloading, and storing the materials; erecting the equipment; and conducting commissioning, training, and startup. *Id.*

32.     Babcock was further "solely responsible for, and [had] control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work." Agreement, § 4(B)(1).

33.     Babcock warranted to Glatfelter that it would "perform its Work in a professional and workmanlike manner in accordance with the applicable code and standard industry practice"; that it was "responsible for the professional quality, technical accuracy, timely completion and coordination of all drawings, scope-related reports and other Work rendered pursuant to [the] Agreement"; and that "[a]ll Work will confirm with the applicable specifications, if any, as set forth in the

[Statement of Work] and be free from defect in design, material and workmanship." *Id.* at § 16.

34.     Babcock agreed to perform the work within specific time deadlines, that those deadlines represented "a reasonable period for performing the Work," that Babcock "shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Time to Perform," and that "time is of the essence." *Id.* at § 9.

35.     Once the Work was installed pursuant to the Agreement, Babcock was permitted to submit for Glatfelter's approval that "Substantial Completion" had been reached.  Agreement, §10.  "Substantial Completion" was defined to be "the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that Glatfelter can occupy or utilize the Work for its intended use." *Id.* at § 1. Under the Agreement, Babcock was required to meet Substantial Completion no later than August 12, 2016. *Id.* at Exhibit B-5.

36.     Once Babcock achieved Substantial Completion (and remaining punch list items were completed), Babcock agreed to meet a separate performance guaranty, under which Babcock guaranteed the boilers would meet certain performance criteria, including, without limitation, the excess air in gas leaving the furnace, steam temperature and volume, boiler efficiency, outside surface

temperature of the boiler shell, the alkalinity and suspended solids present in the concentrated boiler water, flue gas contaminants, and superheater temperature.

37.    In exchange, Glatfelter agreed to pay Babcock over eleven million dollars ($11,705,601), plus additional moneys under change orders. This payment was to be made in installments, over time, based on the status of completion of the Project. *Id.* at Exhibit B-2A.1.

38.    The Agreement authorizes Glatfelter to withhold payment of any amount invoiced by Babcock that Glatfelter disputed in good faith. In addition, Glatfelter could also withhold "all or part of any payment to [Babcock] to such extent as may be necessary to protect itself from loss on account of…defective work not remedied…"  Agreement, § 13.

**D.    Babcock's Delays, Mistakes, and Unapproved Use of
       <u>Subcontractors.</u>**

39.    On June 26, 2015, Glatfelter and Babcock held a kick-off meeting at the Mill, and then Babcock began its design work and plans for fabricating the two boilers. Babcock missed certain early deliverables but still appeared to be on track to meet the requirements of the Contract Documents.

40.    In the interim, Glatfelter proceeded with other portions of the project. Glatfelter engaged contractors to demolish and dispose of the existing boiler house and to begin the construction of what was planned to be a three-story boiler facility within available footprint space.

41.    On May 9, 2016, only a month before Babcock was supposed to begin installation of the boilers, Babcock informed Glatfelter that it had stopped fabrication.

42.    Babcock told Glatfelter that it had closed the facility where it was fabricating Glatfelter's boilers—right in the midst of being manufactured—and had engaged third-party vendors to complete the work.

43.    Closing a manufacturing facility would typically be a planned event, particularly for a company the size of Babcock. Yet, Babcock provided Glatfelter little warning, and only notified Glatfelter of the closing two months prior to the facility closure, and after it had shipped the partial boilers to at least two new vendors with very short notice of this material change.

44.    With the project deadlines approaching, Glatfelter had no choice but to rely upon Babcock's representations and assurances that the boilers would be completed as specified and by the agreed-upon schedule.

45.    Indeed, by this point in the Project, Glatfelter had already paid Babcock $7,725,696.66, and there was not enough time to engage another contractor to complete the boilers before the January 27, 2017 EPA Deadline.

46.    In mid-May 2016, Babcock attempted to deliver a portion of one of the boilers (referred to as a module) but it became stuck in transit. Babcock had failed to account for the size of a tunnel and bridge on its designed delivery route, and the

module could not pass through. When that module finally arrived at the Mill, however, and Babcock attempted to set it on the constructed foundations, the module did not fit—because the boilers were now bigger, delivery was impossible due to existing Mill piping that now interfered with the bigger boilers being able to be moved into the building.

47.    Babcock then admitted that the two boilers were being fabricated at a larger size and would not fit within the boiler facility as designed. This was a major problem because the three-story facility designed to house the boilers was already being constructed. Installed piping had to be removed and then re-installed later at Glatfelter's expense.

48.    To accommodate Babcock's defective work, Glatfelter redesigned the entire boiler facility. The boiler facility would now need to be larger and, given the surrounding operational buildings, taller. What had been designed to be a three-story facility would now need an additional three mezzanines, two penthouses, and an out-building.

49.    On top of these problems, Glatfelter then discovered that Babcock had never fabricated boilers like these before, contrary to its representations. Babcock did not have the experience it had professed in fabricating boilers of this type. Babcock's representations that it had—designed to induce Glatfelter to enter into a contract and pay it millions of dollars—were false and intentionally misleading.

14

50.     Babcock subsequently admitted to other fabrication problems that would cause further delays. Babcock first admitted that it had been late completing the fabrication of another module. Then, Babcock admitted in June that the module had been completed, but it failed an air test and required corrective work. This resulted in a five-week delay.

51.     On June 2, 2016, Babcock admitted that it failed to meet a delivery deadline of May 27, 2016 for one of the boilers, and suggested that it would deliver this boiler seven weeks later, on or before July 18, 2016. Glatfelter objected to the delay, explaining to Babcock that delays would jeopardize the project schedule, particularly after Glatfelter had agreed in March to provide Babcock with a four-week extension.

52.     On June 16, 2016, Babcock sent a letter to Glatfelter claiming that its delays were caused by "changed conditions at the site" as well as Glatfelter's annually scheduled maintenance outage in June, which made it more difficult for Babcock to complete its work. Yet, by this point, Babcock had already missed required project milestones, and the supposed "changed conditions" were actually the facility re-design and construction changes caused by Babcock having fabricated the boilers incorrectly.

53.     Glatfelter notified Babcock in a July 1, 2016 letter that it rejected the assertions and reasoning in Babcock's June 16, 2016 letter. Glatfelter notified

Babcock that it would not agree to any additional time to perform the Work, reiterated the critical deadlines that drove this Project (particularly the EPA Deadline but also regular Mill operations), and demanded the boilers be completed as promised in September.

54.     In response, Babcock represented and promised to Glatfelter in a July 12, 2016 meeting that it would work around-the-clock to complete its Work and that both boilers would be delivered to the Mill by the end of July, "water tight" by the end of August, and mechanically complete (including start-up activities) by mid-September. Glatfelter relied upon these representations and promises in continuing to work with Babcock on the Project.

55.     Babcock's promises were broken less than two weeks later. Intending to set a module on its foundation in the boiler facility on July 30, 2016, Babcock could not lift it from the delivery truck. Despite repeatedly assuring Glatfelter that it had a reliable delivery and installation plan, Babcock selected lifting equipment that was incapable of lifting the module.

56.     Babcock expended another two weeks to address this failure, and the final module arrived onsite on August 9, 2016.

57.     Glatfelter again notified Babcock that every delay—including this one—was impacting the Project, causing additional expenses to be incurred, and affecting the completion of other work.

58.    Babcock's delay in delivering the boilers impacted the entire construction effort. Construction of other parts of the facility could not begin until the boilers had been set in place. Construction trades who had been coordinated and organized to appear and perform their work on a tight time schedule (approved by Babcock) were unable to do anything while waiting for Babcock to deliver the boilers. In some cases, work that had been installed had to be removed while waiting for the boilers, and then reinstalled. Due to Babcock's negligent performance and delayed deliveries, Glatfelter was paying the building trades extra time and overtime as they waited for delivery of the boilers, before racing to complete construction.

59.    Glatfelter had to perform additional work and incur additional, significant costs because of Babcock's delays and defective work, including without limitation:

    a.    Glatfelter had to increase the size of its boiler facility at a cost of approximately $6.4 million, making it larger and adding three mezzanines, two penthouses and an out-building, redesigning and relocating key equipment and systems, and constructing the larger facility;

    b.    Glatfelter had to pay mechanical and electrical contractors to work overtime and hire additional workers so that work that was scheduled to be constructed over a six-month period could be

completed within three months in order to meet the EPA Deadline, increasing Glatfelter's costs by approximately $7 million;

c.      Glatfelter had other increased costs of over $500,000 directly relating to these changes, including renting additional high-lift equipment and other required materials; and,

d.      Glatfelter had to design, fabricate, and install a temporary solution using deionized water to attemperate the superheated system, rather than using condensed sweetwater. A sweetwater condenser system had been designed for one of the boilers. After delivery, it was determined that the sweetwater system could not serve this boiler—and in fact could have caused a catastrophic tube failure. Glatfelter constructed the deionized system to avoid this potentially dangerous condition at a cost of approximately $250,000 (and also utilized other techniques, like spraying water on the superheater tubes, to compensate for the excessive flue gas temperatures until the sweetwater system had been redesigned to accommodate the Babcock boilers that were provided).

60.     With all of the boiler modules finally on-site in August 2016, Babcock could begin assembling the boilers.

61.     However, the boilers did not become operational until nearly six-months later, in January 2017, on the brink of the EPA Deadline. Babcock started one of the boilers on December 6, 2016, which did not become operational until January 26, 2017. Babcock started the other boiler on January 5, 2017, and that boiler was not operational until January 29, 2017.

62.     Under the Agreement, however, the boilers were to be installed and operating by August 12, 2016, and, later, Babcock promised to have this portion of the work completed by mid-September.

63.     Babcock missed these deadlines by many months, causing a major disruption to the project schedule and interfering with Glatfelter's ability to claim an investment tax credit of approximately $6 million on its 2016 federal taxes.

64.     By January 2017, Babcock's work was not even close to complete. Babcock still had to ensure that the boilers met the standard for Substantial Completion, complete training, initial start-up testing, performance testing, and any punch lists the parties generated, and satisfy the standard for Final Completion.

65.     As described further below, Babcock has still not even met Substantial Completion.

### E.     Babcock's Defective Design and Fabrication of the Boilers.

66.     After Babcock started the boilers, it became apparent that they were defectively designed and fabricated. Throughout 2017, Glatfelter discovered myriad problems directly relating to the ability of the boilers to operate as specified, and Babcock—recognizing its deficient and incomplete performance—attempted to address them.

67.     During this year, Babcock was able to remediate some issues, such as excessive steam temperature; steam impurity; the inability to use inside air for combustion; and incorrect control settings on the boiler.

68.     However, Glatfelter and Babcock discovered many other defects throughout 2017, which (as detailed further below) have not been fully resolved, including the failure of the man-safe dampers to seal properly; excessive fan vibration in both boiler fan systems; and the fact that one of the boiler produces steam at a temperature that exceeds the maximum designed temperature (known as excess furnace exit gas temperature, or excess "FEGT").

69.     Also in mid-2017, **cracks and hotspots** appeared on the boilers, indicating that the insulation and refractory within the boiler had failed (or was not designed or installed correctly) and causing the boilers to actually physically crack and become excessively hot. Glatfelter discovered one alarming hotspot that, by

March 2017, grew into a huge scorch mark on the side of the boiler, which is depicted in this photograph and an infrared scan:





70.    The Agreement provided that defective work, or work that "fail[s] to conform to the requirements of the Contract Documents," must be promptly corrected by Babcock at its sole cost, including any costs relating to "additional testing and inspections, the cost of uncovering and replacement, and compensation for the Engineer's services and expenses made necessary thereby." Agreement, § 11(B)(1).

### F.    The April 2017 Boiler Shut-Down, and Babcock's Repeated and Ineffective Corrective Work.

71.    Glatfelter repeatedly notified Babcock of these issues, and many others, and Babcock acknowledged that it had to address these design failures. In April 2017, both boilers were shut down in order for Babcock to inspect the boilers so that a solution could be identified to address all of the issues.

72.    What Glatfelter discovered inside each of Babcock's boilers was worse than anticipated.

73.    As one example, areas within the boilers lacked any insulation whatsoever. Insulation that remained showed signs of melting and being inappropriately affixed to the metal casing. At that time, the boilers looked like they were 20 years old, not 4 months old.



74.     After the April 2017 shut-down, Babcock recognized the gravity of its

deficient performance and that the brand-new boilers were nowhere near complete.

Babcock proceeded to attempt repairs to the boilers, including among other things,

      a.     Improvements to the steam purity and air flow issues;

      b.     Repairs to the cracks and deteriorating integrity of the casing and

           refractory issues;

      c.     Repairs to fix the excessive steam temperature; and

      d.     Repairs to the furnace refractory to address the hot spots.

75.     However, even after nearly one year of repair work by Babcock,

Glatfelter's boilers were still not operating as designed and had significant

deficiencies in performance. Among other things, the most significant ongoing problems included continued deterioration of the insulation and cracks in the boiler casing; vibration of fan rotation at levels that damaged the boilers and steam system; and ongoing excess FEGT.

G.      **The March 2018 Boiler Shut-Down**.

76.     At Babcock's request, Glatfelter agreed in March 2018 to shut down the boilers again to conduct a second inspection to allow Babcock to investigate the state of the boilers, identify the root causes of the ongoing problems, and supply appropriate and workable plans for these problems to be remedied.

77.     The March 2018 inspection revealed several significant unresolved defects:

a.      **Cracks and Physical Defects in Both Boilers**. Both boilers have several new visible deficiencies to the casing and refractory, including cracks, bent tubing, and erosion in the walls of the refractory, depicted in the images below.

*Defects in PB6's Refractory[1]*

---

[1] The boilers are also known as Power Boiler 6 and Power Boiler 7, or PB6 and PB7, respectively.



Burner cracking worse.



Bent tubing.



Refractory erosion.



Gaps and cracking.

*Defects in PB7's Refractory*



Burner cracking worse.



Tube growing into refractory.









b.   **Fan Vibration and Rotational Stall.** The fan blades in both

boilers experience stalling during operation at most loads, which

results in the air flow separating from one of the fan blades and

causes noticeable and damaging vibration throughout the steam

system and impacting the burner performance. The excessive fan

and duct vibration also causes the boilers to literally shake off

instruments that had been installed, as shown in the photo below

with PB7:

26



**FEGT Remains Excessive**. Most importantly, the boiler casing external temperature continues to exceed maximum allowable temperature in the Agreement of 140 degrees Fahrenheit. Thermographic images show that PB6 has an average external surface temperature of 194.9 degrees Fahrenheit, with a maximum surface temperature observed of **482.5 degrees Fahrenheit**.



As for PB7, thermographic images show that its average external boiler casing temperature is 182.7 degrees Fahrenheit, with a maximum observed surface temperature of

**568.4 degrees Fahrenheit**.



78.     Babcock has admitted that its deficient performance is a direct cause of

these defects and that the boiler vibration and temperature defects must be fixed.

79.     Babcock made an effort to fix these problems, but without any satisfactory results. Babcock requested additional multi-week repairs in 2018 and 2019 to work on remedying the numerous boiler defects. Most of Babcock's "fixes" were short-term, however, and never adequately addressed and resolved the root causes of the defects, and Glatfelter had to incur its own expenses to account for the boiler failures.

80.     For instance, in November 2018, Glatfelter installed an auxiliary boiler, exterior to the boiler facility in order to provide additional power, as necessary, to accommodate performance issues with the two boilers provided by Babcock.

81.     Also in November 2018, Babcock performed additional repairs on one of the boilers, attempting to address the failure of insulation and refractory in the superheat section of the boiler, the vibration in the fan system by replacing ducting with stiffened ductwork, and adding a bypass damper and expansion joint, among other identified repairs. However, these repairs were also unsuccessful, requiring the boilers to experience significant downtime in December 2018 to address boiler vibration and surface temperature issues. Further testing revealed that the changes did not improve the boiler performance, with the boilers experiencing the same problems.

82.     Despite years of attempts to correct its defective work, Babcock never provided the boilers it agreed to provide. To the contrary, Babcock's boilers have

caused Glatfelter to experience years of uncertainty and unreliable performance, significant increased costs, and countless hours for troubleshooting and monitoring the boilers' performance for safety and deficiencies.

83.    The Mill relies upon these boilers to operate. While the Mill is also supported by two other boiler systems (that do not run on natural gas), they are not capable of powering the Mill for any length of time on their own.

84.    On October 31, 2018, Glatfelter sold the Mill to Pixelle Specialty Solutions LLC but retained the rights to pursue these claims against Babcock.

85.    Glatfelter is entitled to a return of all of the moneys it has paid Babcock, plus significant additional damages and expenses incurred with respect to these defective boilers, totaling in excess of $58.9 million, for the reasons detailed below.

## COUNT I – BREACH OF CONTRACT

86.    Glatfelter incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

87.    Glatfelter and Babcock entered into a valid, binding, enforceable Agreement, whereby, among other obligations, Babcock agreed to design, fabricate, deliver, and install two boilers at the Mill pursuant to a certain project schedule and milestones.

88.   Glatfelter has performed under the Agreement by, among other things, making progress payments to Babcock for the design and fabrication of the two boilers.

89.   Babcock has breached the Agreement by, among other things, failing to deliver boilers by the required deadlines, failing to provide boilers that meet the design criteria, and failing to fabricate the boilers in any appropriate workmanlike manner given the numerous design, performance, and operational issues.

90.   Despite Glatfelter's repeated requests to Babcock to remedy these issues so that the boilers operate as specified and intended, Babcock failed to develop a plan for correcting the defective work and has failed to correct the defective work, in violation of its obligations under the Agreement.

91.   In addition to the cost of the boilers themselves, all payments to Babcock, delay damages and related construction delay costs, and all expenses relating to troubleshooting and repair efforts, Glatfelter incurred additional millions of dollars in additional expenses redesigning its boiler facility due to Babcock's fabrication of the two boilers at a much larger size than originally presented

92.   As a direct and proximate cause of these and other breaches of the Agreement, Glatfelter has suffered and will continue to suffer significant harm, currently estimated to exceed $58.9 million, in an amount to be calculated at trial.

WHEREFORE, Plaintiff Glatfelter demands judgment in its favor and against Defendant Babcock, and requests that this Court enter an Order for all damages as permitted by law, reasonable attorneys' fees and costs, and all such other relief as the Court may deem just and proper.

## COUNT II – FRAUD

93.    Glatfelter incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

94.    Babcock represented to Glatfelter that it had experience and expertise in the design and fabrication of the specific boilers which Glatfelter sought to purchase, that it had manufactured these exact boilers before, and that Babcock would fabricate Glatfelter's boilers at its facility in West Point, Mississippi.

95.    Babcock's representations were false or were made recklessly without regard to truth or falsity. Babcock had never designed or fabricated the type of boilers that Glatfelter sought to purchase, and Babcock omitted the highly material information that it was about to close the Mississippi facility where Glatfelter's boilers were supposed to be fabricated, and was planning on outsourcing that work to a vendor subcontractor.

96.    Babcock's misrepresentations and fraudulent omissions were made with the intent of misleading Glatfelter to rely upon these representations in selecting Babcock as the boiler contractor and entering into the Agreement.

97.   Glatfelter justifiably relied on these representations by Babcock when it selected Babcock as its boiler contractor.

98.   As a direct and proximate cause of Babcock's fraudulent representations, Glatfelter has suffered and will continue to suffer damages.

99.   In addition to the cost of the boilers themselves, all payments to Babcock, delay damages and related construction delay costs, and all expenses relating to troubleshooting and repair efforts, Glatfelter has incurred millions of dollars in additional damages redesigning its boiler facility and surrounding properties due to Babcock's fabrication of the two boilers at an incorrect size without approval from Glatfelter. Glatfelter spent tens of millions more to remediate and replace these defective boilers, which cannot be repaired despite Babcock's extensive attempts.

WHEREFORE, Plaintiff Glatfelter demands judgment in its favor and against Defendant Babcock, and requests that this Court enter an Order for all damages as permitted by law, reasonable attorneys' fees and costs, and all such other relief as the Court may deem just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION

100.   Glatfelter incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

101.   Babcock represented to Glatfelter that it had experience and expertise in the design and fabrication of the specific boilers which Glatfelter sought to purchase, that it had manufactured these exact boilers before, and that Babcock would fabricate Glatfelter's boilers at its facility in West Point, Mississippi.

102.   Babcock made these representations under circumstances where it should have known and could have reasonably foreseen that these representations were false. Babcock had never designed or fabricated the type of boilers that Glatfelter sought to purchase, and Babcock omitted the highly material information that it was about to close the Mississippi facility where Glatfelter's boilers were supposed to be fabricated, and was planning on outsourcing that work to a vendor subcontractor.

103.   Babcock's negligent misrepresentations were made with the intent of inducing Glatfelter to rely upon these representations in selecting Babcock as the boiler contractor and entering into the Agreement.

104.   Glatfelter justifiably relied on these representations by Babcock when it selected Babcock as its boiler contractor.

105.   As a direct and proximate cause of Babcock's negligent representations, Glatfelter has suffered and will continue to suffer damages in excess of $58.9 million, in an amount to be proven at trial.

WHEREFORE, Plaintiff Glatfelter demands judgment in its favor and against Defendant Babcock, and requests that this Court enter an Order for all damages as permitted by law, reasonable attorneys' fees and costs, and all such other relief as the Court may deem just and proper.

## COUNT IV – PROMISSORY ESTOPPEL

106.   Glatfelter incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

107.   Babcock made promises to Glatfelter that it had experience and expertise in the design and fabrication of the specific boilers which Glatfelter sought to purchase, that it had manufactured these exact boilers before, and that Babcock would fabricate Glatfelter's boilers at its facility in West Point, Mississippi.

108.   Babcock's promises were misrepresentations, made intentionally, recklessly without regard to truth or falsity, or negligently. Babcock had never designed or fabricated the type of boilers that Glatfelter sought to purchase, and Babcock omitted the highly material information that it was about to close the Mississippi facility where Glatfelter's boilers were supposed to be fabricated, and was planning on outsourcing that work to a vendor subcontractor.

109.   Glatfelter reasonably relied upon Babcock's false promises when it selected Babcock as the boiler contractor and entered into the Agreement, and Babcock should be estopped from disavowing these promises now.

110.   Injustice and harm to Glatfelter can be avoided only if the Court enforces Babcock's promises.

111.   As a direct and proximate cause of Babcock's promises, Glatfelter has suffered and will continue to suffer damages in excess of $58.9 million, in an amount to be proven at trial.

WHEREFORE, Plaintiff Glatfelter demands judgment in its favor and against Defendant Babcock, and requests that this Court enter an Order for all damages as permitted by law, reasonable attorneys' fees and costs, and all such other relief as the Court may deem just and proper.

## COUNT V – UNJUST ENRICHMENT

112.   Glatfelter incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

113.   Glatfelter has conferred benefits on Babcock not only in the form of the payment of amounts to obtain two natural-gas fired boilers that would meet Glatfelter's specifications and schedule, but also in the form of the time, expense, and burden of redesigning the boiler facility for the sole purpose of accommodating Babcock—because Babcock failed to fabricate the boilers to the size and shape specified.

114.   Babcock has accepted and retained these financial benefits.  Glatfelter's redesign of the boiler facility permitted Babcock to avoid the significant time and

expense of having to refabricate the boilers to the size and shape that Glatfelter had originally specified.

115.   Glatfelter conferred these benefits on Babcock to its detriment.

116.   It is inequitable and against good conscience to allow Babcock to retain the moneys that Glatfelter paid to Babcock, and the financial benefits that Babcock avoided because Glatfelter incurred those expenses in its stead.

117.   Babcock has been unjustly enriched in excess of $9.5 million, in an amount to be proven at trial, and that amount should be paid over to Glatfelter.

WHEREFORE, Plaintiff Glatfelter demands judgment in its favor and against Defendant Babcock, and requests that this Court enter an Order for all damages as permitted by law, reasonable attorneys' fees and costs, and all such other relief as the Court may deem just and proper.

Respectfully submitted,

**BLANK ROME LLP**

By:  */s/ Stephanie C. Chomentowski*
DANIEL E. RHYNHART
STEPHANIE C. CHOMENTOWSKI
MELANIE S. CARTER
One Logan Square
Philadelphia, PA 19103
Rhynhart@blankrome.com
Chomentowski@blankrome.com
MCarter@blankrome.com
(215) 569-5371 – phone
(215) 832-5371 – facsimile

*Attorneys for Plaintiff P. H. Glatfelter Company*

Dated: December 27, 2019