**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| P. H. GLATFELTER COMPANY, | : | Civil No. 1:19-CV-02215 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BABCOCK & WILCOX POWER | : | |
| GENERATION GROUP, INC., | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is Defendant's motion to dismiss and to strike pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure. (Doc. 14.) This action was brought by Plaintiff, P. H. Glatfelter Company ("Glatfelter"), to recover damages for, *inter alia*, the alleged breach of contract by Defendant, Babcock & Wilcox Power Generation Group, Inc. ("Babcock"), to replace Glatfelter's aging industrial boiler system used to power its paper manufacturing processes. (Doc. 1, pp. 1–4.)[1] Babcock has moved to dismiss four of the five counts in the complaint, including Glatfelter's claims for fraud, negligent misrepresentation, promissory estoppel, and unjust enrichment.[2] (Doc. 14.) The court finds that Glatfelter's claims for fraud and negligent misrepresentation are presently barred by the application of Pennsylvania's parol evidence rule; Glatfelter's claims for

---

[1] For ease of reference, the court utilizes the page number from the CM/ECF header.

[2] The remaining count, not subject to Babcock's motion to dismiss, is for breach of contract.

promissory estoppel and unjust enrichment are properly pled in the alternative; Glatfelter's damages will be capped by the contract's limitation on liability clause if there is found to be a valid contract after discovery; and "Babcock & Wilcox Power Generation Group, Inc." will be dismissed from this case as a non-entity. The court will therefore deny the motion to strike, and grant in part and deny in part the motion to dismiss.  (Doc. 14.)

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

According to its complaint, Glatfelter is a global supplier of engineered materials that previously owned a paper mill ("the Mill") in Spring Grove, Pennsylvania used to produce a variety of paper products.  (Doc. 1, pp. 5−6.)  The Mill generates its own power from three interconnected boiler systems.  (*Id.* at 6.) These systems produce steam necessary for the papermaking process and energy to power the Mill, the excess of which is sold to third parties in the regional power grid.  (*Id.*)  To generate this steam, the Mill relied on coal-fired boilers.  (*Id.* at 7.)

In 2013, the United States Environmental Protection Agency ("EPA") issued new regulations intended to reduce emissions from industrial facilities utilizing boilers.  (*Id.*)  In pertinent part, these regulations required industrial facilities, like the Mill, to comply with more stringent emissions metrics by January 27, 2017. (*Id.*)  Glatfelter alleges that these regulations foreclosed its use of coal-fired boilers and necessitated a new boiler system and infrastructure.  (*Id.*)  To comply with the

EPA's requirements, Glatfelter claims that it created a detailed plan for the construction and installation of new, natural gas-powered boilers and the infrastructure needed to harness the steam for use in its papermaking processes. (*Id.* at 7–8.)  In September 2014, Glatfelter issued a request for proposals for the "design, fabrication, and installation of two natural gas-powered boilers that would meet Glatfelter's specifications and could be installed under Glatfelter's schedule." (*Id.* at 8.)

Glatfelter asserts that Babcock, a steam-generating boiler manufacturer with significant experience in the industry, submitted a response to Glatfelter's request on October 31, 2014.  (*Id.*)  After a lengthy negotiation period, Glatfelter claims that the parties entered into a construction agreement on May 15, 2015 for the design, fabrication, and installation of the boilers at the Mill.  (*Id.* at 9.)  Glatfelter alleges that Babcock's proposal was not the least expensive option, but it selected Babcock based on its proposal, its representation that it had "significant experience in the design and fabrication of the precise types of boilers that Glatfelter was seeking," and Glatfelter's understanding that Babcock would manufacture the boilers at its facility in West Point, Mississippi.  (*Id.*)

Under the agreement, Babcock would provide all labor, materials, and services necessary for the design, fabrication, delivery, and installation of the boilers and related equipment, and was solely responsible for the methods, means,

3

techniques, and sequencing of construction.  (*Id.* at 10.)  The parties' contract states that Babcock would conform to Glatfelter's specifications, provide professional quality work, and perform its obligations within specific deadlines, noting that "time is of the essence" for the construction.  (*Id.* at 10−11.)  After the work was installed under the agreement such that Glatfelter could use the boilers for its manufacturing operations, Babcock agreed to meet continuing performance metrics for the boilers to ensure their ongoing use.  (*Id.* at 11−12.)  In total, the contract provided that Glatfelter would pay Babcock $11,705,601, plus any agreed-upon changes, over a period of installments for the project.  (*Id.* at 12.)

The agreement also provided a number of remedies for Glatfelter in the event of breach by Babcock.  For instance, if Babcock breached or defaulted under the agreement, Glatfelter "may, without prejudice to other remedies Glatfelter may have," correct such breach, and then deduct the reasonable costs to correct the breach from payments otherwise owed to Babcock.  (Doc. 1-2, pp. 5, 15.)  In addition, Glatfelter reserved the right to request that Babcock correct nonconforming work.  (*Id.*)  Glatfelter also reserved the right to withhold payment from Babcock "to such extent as may be necessary to protect itself from loss" due to a variety of conditions, including, *inter alia*, defective work that had not been remedied, Babcock's failure to cure a breach of the agreement, or evidence of Babcock's financial insecurity that could jeopardize completion.  (*Id.* at 17−18.)

Glatfelter retained the right to terminate its agreement with Babcock, "in whole or in part for any reason whatsoever upon no less than thirty (30) days prior written notice." (*Id.* at 22.)  This provision also set forth the process for dissolution of the parties' relationship and withdrawal from the contract in the event that Glatfelter was dissatisfied with Babcock's performance, or for any other reason. (*Id.* at 22–23.)  Finally, Glatfelter retained the right to bring suit in either the York County Court of Common Pleas or the Middle District of Pennsylvania for "all claims and causes of action, whether in contract, tort, breach of warranty or otherwise[.]" (*Id.* at 27–28.)

In addition, the contract contains mutual limitation of liability clauses, appearing in all capital letters. (*Id.* at 25.)  These clauses provide as follows:

> With the exception of damages arising from breach of confidentiality under Article 26, in no event shall a party be liable to the other party for any incidental, indirect, special, consequential, punitive or exemplary damages or loss of profits, non-operation or increased expense of operation, claims of the other party's customer, subcontractors, vendors or suppliers, loss of use of capital or revenue, or for fines or penalties assessed or levied against Glatfelter based on the operation, non-operation or use of the equipment arising out of, or in connection with, the agreement or any part thereof, whether or not advised of the possibility of such damage.
>
> In no event shall Glatfelter's liability for any claim of negligence, strict liability or any other legal or equitable theory whatsoever arising out of or in connection with this agreement exceed the purchase price.
>
> Except for claims of third parties for bodily injury, death, property damage or intellectual property infringement pursuant to [Babcock's]

indemnity obligations in Article 28, in no event shall [Babcock's] aggregate liability for any claim, whether arising out of tort (including negligence), strict liability or any other legal or equitable theory whatsoever, arising out of or in connection with this agreement exceed the purchase price. The limitations will apply notwithstanding any failure of essential purpose of any limited remedy provided herein.

(*Id.*)

The parties' contract also includes an integration clause, stating that:

This Agreement represents the entire agreement between the Parties with respect to the subject matter hereof, [and] supersedes all prior contracts, correspondence, negotiations, discussions or understanding as well as any terms and conditions which may be attached to or incorporated in [Babcock's] quotation(s), offer(s) or invoice(s). Amendments to this Agreement must be in a writing that specifies it is an amendment to this Agreement and must be signed by duly authorized representatives of the Parties.

(*Id.* at 28.)

Glatfelter alleges that the parties "held a kick-off meeting at the Mill" on June 26, 2015, and that Babcock began the design and planning process for the two boilers. (Doc. 1, p. 12.) Meanwhile, Glatfelter claims that it began work on the other aspects of construction, including demolition and disposition of the existing boilers and boiler house, and construction of a new, three-story boiler facility. (*Id.*) On May 9, 2016, Glatfelter alleges that Babcock sent notice that it had stopped fabrication of the boilers one month before installation was set to begin because Babcock's West Point, Mississippi facility, where the boilers were being manufactured, was being shut down. (*Id.* at 13.) Babcock had allegedly

designated the remaining work to third-party contractors. (*Id.*)  While Glatfelter

asserts that this transition was unplanned and gave rise to some concern, the

pending project deadlines and sunk costs of almost $8 million motivated it to

continue its relationship with Babcock. (*Id.*)  In mid-May 2016, Babcock

attempted to deliver and install a portion of one of the boilers, but Glatfelter claims

that the boilers had been "fabricated at a larger size and would not fit within the

boiler facility as designed." (*Id.* at 14.)  Glatfelter alleges that the facility to house

the boilers was already under construction and needed to be redesigned and

reconstructed to accommodate the larger boilers both in footprint and in height,

which cost an additional $6.4 million. (*Id.* at 14, 17.)  Around the same time,

Glatfelter asserts that it discovered that Babcock had never fabricated boilers like

Glatfelter's before, contrary to its prior assertions during negotiations. (*Id.* at 14.)

By June 2016, Glatfelter claims that Babcock continued to send notice of

further delays in fabrication and delivery of the boilers, causing it to miss deadlines

established in the parties' contract. (*Id.* at 15.)  Glatfelter alleges that it sent notice

to Babcock in September 2016 that its delays were unacceptable and demanded

that the boilers be completed according to the schedule. (*Id.* at 15–16.)  After

further discussion, Babcock agreed to expedite its production and delivery

schedule and have both boilers "delivered to the Mill by the end of July, 'water

tight' by the end of August, and mechanically complete (including start-up

activities) by mid-September." (*Id.* at 16.)  Glatfelter asserts that Babcock also

neglected to meet these deadlines, failing to deliver the final piece of the boilers

until August 9, 2016, thus delaying the construction efforts at the other parts of the

boiler facility.  (*Id.* at 16–17.)  According to the complaint, the boilers were not

ultimately operational until January 26 and 29, 2017, respectively.  (*Id.* at 19.)

      Glatfelter claims that even after the boilers were completely installed, there

were continued malfunctions and defects in the boilers which rendered them unsafe

and, for some periods of time, inoperable while Babcock attempted to make

repeated repairs.  (*Id.* at 20–30.)  Despite all of Babcock's repair efforts, Glatfelter

alleges that the boilers remained unreliable and have caused "significant increased

costs, and countless hours for troubleshooting and monitoring the boilers'

performance for safety and deficiencies."  (*Id.* at 30–31.)  On October 31, 2018,

Glatfelter asserts that it sold the Mill, but retained the rights to pursue legal claims

against Babcock.  (*Id.* at 31.)

      On the basis of these facts, Glatfelter filed a complaint on December 27,

2019, alleging claims for breach of contract, fraud, negligent misrepresentation,

promissory estoppel, and unjust enrichment, and seeking damages in excess of

$58.9 million.  (Doc. 1.)  On March 16, 2020, Babcock filed the instant motion to

dismiss, asserting, *inter alia*, that Glatfelter's claims for fraud, negligent

misrepresentation, promissory estoppel, and unjust enrichment fail as a matter of

law, and that Glatfelter's claims for damages should be capped at the amount set forth in the underlying contract.  (Doc. 14.)  On April 13, 2020, Glatfelter filed a brief in opposition.  (Doc. 17.)  Babcock timely filed a reply brief.  (Doc. 21.) Thus, this motion is ripe for review.

**JURISDICTION**

The court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties have complete diversity and the amount in controversy exceeds $75,000.  Further, venue is appropriate because the action detailed in the complaint occurred in the Middle District of Pennsylvania.

**STANDARD OF REVIEW**

**A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

### B. Motion to Strike Under Federal Rule of Civil Procedure 12(f)

Under Federal Rule of Civil Procedure 12(f), a party can move a district court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." This rule is "designed to reinforce the requirement in Rule 8 . . . that pleadings be simple, concise, and direct." 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1380 (3d ed. 2020 update). To that end, the purpose of any motion to strike should be to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012) (citation omitted).

Motions to strike should not be used to persuade a court to determine disputed questions of law. *See Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 218 (D.N.J. 1993) (citations omitted). They also "may not serve as an avenue to procure the dismissal of all or part of a complaint." *Davila v. N. Reg'l Joint Police Bd.*, 979 F. Supp. 2d 612, 624 (W.D. Pa. Oct. 21, 2013), *vacated in part on*

*reconsideration*, 2014 U.S. Dist. LEXIS 102143 (July 28, 2014) (citing *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 530–31 (D.N.J. 2012)).

The burden rests with the moving party to show that the challenged matter should be stricken.  *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019).  Thus, the movant must demonstrate that the matter falls within one of the categories listed in Rule 12(f).  "Immaterial" matter is that which "has no essential or important relationship to [any] claim[s] for relief." *Wagner v. Holtzapple*, 101 F. Supp. 3d 462, 488 (M.D. Pa. 2015) (citing *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995)). "Impertinent" matter consists of "statements that do not pertain, and are not necessary, to the issues in question."  *Id.* (citation omitted).  And "scandalous" matter is that which "casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court."  *Id.* (citing *Carone v. Whalen*, 121 F.R.D. 231, 232 (M.D. Pa. 1988)).

## DISCUSSION

In this case, Babcock argues that portions of the complaint should be dismissed as follows: (1) Glatfelter's claims for fraud and negligent misrepresentation should be dismissed as a matter of law as barred by Pennsylvania's parol evidence rule; (2) Glatfelter's claim for fraud should be dismissed for failure to state this claim with particularity as required by Federal

Rule of Civil Procedure 9(b); (3) Glatfelter's claims for fraud and negligent misrepresentation should be dismissed because they are barred by the gist of the action and economic loss doctrines under Pennsylvania law; (4) Glatfelter's claims for promissory estoppel and unjust enrichment should be dismissed as a matter of law because there is undisputedly an enforceable contract in this case; (5) Glatfelter's claims for damages in excess of the contract price of $11,705,601 should be dismissed because the plain language of the contract caps damages for both parties, regardless of the action pursued, at this figure; and (6) Babcock & Wilcox Enterprises, Inc. should be dismissed because it was not a contracting party and thus should have no involvement in this case.  (Doc. 14.)  The court will address these arguments below.

### A. Glatfelter's Claims for Fraud and Negligent Misrepresentation will be Dismissed Without Prejudice.

Babcock moves to dismiss Glatfelter's claims for fraud and negligent misrepresentation because Glatfelter bases these claims on representations made by Babcock prior to contract formation.  Since the agreement contains an integration clause, Babcock argues that its pre-contract representations cannot be considered to support Glatfelter's claims for fraud and negligent misrepresentation under Pennsylvania's parol evidence rule.  Glatfelter contends that the parties' agreement, appended as an exhibit to its complaint, does not include all documents intended to be part of the final contract.  Specifically, Glatfelter asserts that there

are additional documents, including Babcock's bid documents and proposal forms,

that the parties intended to be part of the contract, but that have not yet been

presented to the court.  Babcock rejoins that Glatfelter conspicuously fails to allege

that these missing documents contain the alleged misrepresentations by Babcock

that would give rise to a claim for either fraud or negligent misrepresentation.

> The alleged representations at issue are as follows:
>
> Babcock represented to Glatfelter that it had experience and expertise in the design and fabrication of the specific boilers which Glatfelter sought to purchase, that it had manufactured these exact boilers before, and that Babcock would fabricate Glatfelter's boilers at its facility in West Point, Mississippi.
>
> . . . .  Babcock had never designed or fabricated the type of boilers that Glatfelter sought to purchase, and Babcock omitted the highly material information that it was about to close the Mississippi facility where Glatfelter's boilers were supposed to be fabricated, and was planning on outsourcing that work to a vendor subcontractor.
>
> Babcock's [negligent] misrepresentations [and fraudulent omissions] were made with the intent of [inducing] Glatfelter to rely upon these representations in selecting Babcock as the boiler contractor and entering into the Agreement.

(Doc. 1, pp. 33, 35.)  The complaint also states that: "In its proposal, and in

subsequent discussions with Glatfelter, Babcock represented that it had significant

experience in the design and fabrication of the precise types of boilers that

Glatfelter was seeking, and that Babcock would fabricate Glatfelter's boilers at its

facility in West Point, Mississippi."  (*Id.* at 9.)  Thus, Glatfelter claims that

Babcock allegedly made these representations intending to induce Glatfelter to contract with Babcock for its boiler replacement project.

Under Pennsylvania law,[3] fraudulent inducement occurs where a party makes "false representations that induce[] the complaining party to agree to the contract." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 205 (Pa. 2007) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437 n.26 (Pa. 2004) (quotation marks omitted)).  In other words, but for the party's representations, the complaining party would not have entered into the agreement.  *Youndt v. First Nat'l Bank*, 868 A.2d 539, 546 (Pa. Super. Ct. 2005) (citing *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. Super. Ct. 2002)).  Based on this standard, Glatfelter's fraud and negligent misrepresentation claims are essentially claims for fraudulent inducement to contract with Babcock for the boilers.[4]  As such, these claims are subject to Pennsylvania's parol evidence rule.  *Toy*, 928 A.2d at 204–05.

The parol evidence rule states that:

---

[3] The court applies the substantive law of Pennsylvania to this dispute since the court is exercising diversity jurisdiction in this case.  *Erie R.R. Co. v. Tompkins*, 304 U.S 64, 78 (1938); *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000).  In addition, the court notes that the contract contains a choice of law provision designating Pennsylvania law as applicable to any disputes.  (Doc. 1-2, pp. 28–29.)  Moreover, neither party objects to the application of Pennsylvania law.

[4] Glatfelter appears to argue in its opposition brief that it also seeks damages for negligent misrepresentations made by Babcock after the contract had been formed and performance was underway.  (Doc. 17, pp. 15–16.)  However, the court notes that count III of the complaint only includes statements and facts regarding the negligent misrepresentations allegedly made by Babcock before the contract was formed.

> Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically covered by the written contract are merged in or superseded by that contract.

*Id.* at 545–46 (quoting *Blumenstock*, 811 A.2d at 1037 (quotation marks omitted)). Thus, a party cannot vary the terms of its final agreement through the introduction of alleged prior representations from the opposing party. *Id.* Pennsylvania courts deem an agreement final where an integration or merger clause is present stating "that the writing is meant to represent the parties' entire agreement." *Toy*, 928 A.2d at 204 (citing *Yocca*, 854 A.2d at 436). The presence of this clause "is a clear sign that the writing is meant to be [final], and thereby expresses all of the parties' negotiations, conversations and agreements made prior to its execution." *Id.*

There are, however, certain exceptions to the application of the parol evidence rule where fraud is alleged. "Whether parol evidence is admissible in proving a claim for fraud initially depends on the nature of the alleged fraud." *Youndt*, 868 A.2d at 546. While Pennsylvania courts have allowed the admission of parol evidence for claims of fraud in the execution of a contract, "parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract." *Toy*, 928 A.2d at 205 (quoting *Yocca*, 854 A.2d at 437 n.26 (quotation marks omitted)). This ban on parol evidence

applies equally to claims for negligent misrepresentation and claims for fraudulent inducement.  *Pass v. Palmiero Auto. of Butler, Inc.*, 229 A.3d 1, 8 (Pa. Super. Ct. 2020).

In this case, the contract at issue includes an integration clause.  (*See* Doc. 1-2, p. 28 ("This Agreement represents the entire agreement between the Parties with respect to the subject matter hereof, [and] supersedes all prior contracts, correspondence, negotiations, discussions or understanding.").)  Thus, based on Pennsylvania law's presumption that an integration clause is proof of a completely integrated agreement, the court will presume that the parties' contract is a final and complete representation of their agreement which cannot be varied or altered by the introduction of parol evidence.  *Toy*, 928 A.2d at 204 (citing *Yocca*, 854 A.2d at 436).  Further, since Glatfelter's complaint alleges claims for fraudulent inducement, the court cannot consider parol evidence to prove these claims. Therefore, Babcock's alleged representations made to induce Glatfelter to choose Babcock for the boiler project must be contained somewhere within the parties' contract in order for the court to consider them.

It is clear from the face of the complaint, the attached exhibits, and Glatfelter's arguments that the court has not been presented with the entire agreement between the parties.  (Doc. 17, p. 26.)  By way of example, the first page of the contract notes that exhibits A, B, C, and D are included and

incorporated into the agreement, but the contract attached to Glatfelter's complaint only includes what appear to be portions of exhibits A and B.  (Doc. 1–2, pp. 2, 30–42.)

However, it is not clear that the omitted contract documents contain Babcock's alleged misrepresentations which would give rise to Glatfelter's fraud and negligent misrepresentation claims.  (*See* Doc. 1, pp. 33, 35.)  The court notes that various portions of the contract reference Babcock's bid documents and appear to integrate these documents into the contract, but the court has not been provided with them and it is not clear from the face of the complaint and the attached exhibits that these documents include the misrepresentations that Glatfelter alleges. (Doc. 1-2, pp. 2, 9, 36 ("'Contract Documents'" means all of the documents comprising this Agreement, including . . . the Bid Documents[.]").)  Rather, it appears that these documents may contain logistical planning and framework ideas for the fabrication and installation of Glatfelter's new boilers, but the court does not discern representations regarding Babcock's experience in the industry, experience manufacturing the specific boilers at issue, or where the boilers would be manufactured.  (*See id.* at 2, 36.)

The contract also contains references to Babcock's proposal forms, but it is unclear whether these forms were intended to be part of the contract, and they have likewise not been produced for the court's review.  (Doc. 1, p. 9; Doc. 1-2, pp. 4,

35−37, 42.)  Indeed, the contract states that: "No terms stated by [Babcock] in its proposal or in accepting or acknowledging this Agreement shall be binding except as expressly incorporated herein by Glatfelter."  (Doc. 1-2, p. 4.)  Moreover, even if the proposal documents, or portions thereof, were intended to be part of the contract, it is not at all evident that Babcock's alleged misrepresentations were intended to be part of the contract.  (*Id.*)

Thus, it is not apparent from the face of the complaint and the attached exhibits that Babcock's alleged misrepresentations, which would give rise to Glatfelter's fraud and negligent misrepresentation claims, are part of the contract. Because it is not evident to the court that the alleged misrepresentations were expressly incorporated into the parties' agreement by Glatfelter, the court will grant Babcock's motion to dismiss Glatfelter's claims for fraud and negligent misrepresentation without prejudice to Glatfelter amending its complaint to include these documents that were made part of the parties' contract.[5]

---

[5] Because the court finds that Glatfelter's fraud and negligent misrepresentation claims should be dismissed on parol evidence grounds, the court need not address Babcock's arguments that these claims should be dismissed on Federal Rule of Civil Procedure 9(b) grounds or as barred by Pennsylvania's gist of the action or economic loss doctrines.  The court declines to address these arguments at this time, but notes that Babcock's ability to re-raise these issues on a renewed motion to dismiss is not foreclosed if Glatfelter amends its complaint.

However, the court notes that if Glatfelter opts to amend its complaint to include these forms, potential issues under Federal Rule of Civil Procedure 9(b) may be resolved.  Specifically, if Glatfelter's allegations are substantiated, and Babcock's bid documents and proposal forms contain the alleged misrepresentations which are part of the parties' contract, then these forms could contain the who, what, where, when, and how pieces required under Rule 9(b)'s particularity requirement that is lacking currently.  *See Lum v. Bank of Am.*, 361 F.3d 217, 223

### B. Glatfelter's Claims for Promissory Estoppel and Unjust Enrichment will not be Dismissed.

Babcock moves to dismiss Glatfelter's promissory estoppel and unjust enrichment claims as a matter of law because Babcock posits that these claims are foreclosed by the existence of an enforceable contract which neither party disputes. Glatfelter counters that it has pled these claims in the alternative, recognizing that it cannot ultimately succeed on both claims for breach of contract and promissory estoppel or unjust enrichment.

Pennsylvania law allows a plaintiff to plead alternative causes of action for both breach of contract and equitable remedies. *Shafer Elec. & Constr. v. Mantia*, 67 A.3d 8, 9 n.2 (Pa. Super. Ct. 2013) ("Courts in this Commonwealth have continually recognized that a litigant may advance alternative or conflicting theories of recovery, including causes of action for breach of contract and *quantum meruit*/unjust enrichment.") (citing *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 n.5 (Pa. Super. Ct. 2009), *appeal denied*, 980 A.2d 609 (Pa. 2009); *Halstead v. Motorcycle Safety Found., Inc.*, 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999); *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F. Supp. 1038, 1043 (E.D. Pa.

---

(3d Cir. 2004); *Meyers v. Alexander*, No. 1:12-cv-1276, 2012 U.S. Dist. LEXIS 121807, at *11 (M.D. Pa. Aug. 8, 2012) (quoting *Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (quotation marks omitted)), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 121810 (Aug. 28, 2012).

1994)).  Indeed, courts in the Middle District have reached similar outcomes when applying Pennsylvania law.  *See, e.g.*, *Animalscan, LLC v. Live Oak Veterinary Specialists, LLC*, No. 3:18-cv-2288, 2019 U.S. Dist. LEXIS 136581, at *11–13, 23–24 (M.D. Pa. Aug. 13, 2019) (holding that while claims for unjust enrichment and promissory estoppel may be pled in the alternative to a claim for breach of contract, these claims for equitable relief must be dismissed once a valid contract is found to exist); *Bill Goodwin Constr., LLC v. Wondra Constr., Inc.*, No. 3:13-cv-157, 2014 U.S. Dist. LEXIS 49652, at *29–30 (M.D. Pa. Apr. 10, 2014) (noting that "[c]ourts in Pennsylvania have continually recognized that a litigant may advance alternative or conflicting theories of recovery, including causes of action for breach of contract and unjust enrichment"); *18 KT.TV, LLC v. Entest Biomed., Inc.*, No. 3:11-cv-244, 2011 U.S. Dist. LEXIS 128435, at *16–17 (M.D. Pa. Nov. 7, 2011) (finding that alternative claims for unjust enrichment and breach of contract are allowed under Pennsylvania law and Federal Rule of Civil Procedure 8(d)(2)).

Thus, while Glatfelter cannot ultimately maintain claims for both breach of contract and equitable remedies, it may do so at the pleading stage since "discovery may reveal that the contract was invalid, making an unjust enrichment claim necessary for recovery." *18 KT.TV, LLC*, 2011 U.S. Dist. LEXIS 128435 at *17.  Therefore, Babcock's motion to dismiss Glatfelter's claims for promissory

estoppel and unjust enrichment will be denied without prejudice to renewal on a summary judgment motion after discovery has established the existence, or non-existence, of a valid contract.

### C. Glatfelter's Damages Claims are Limited by Contract in the Event that a Valid Contract Exists, but Glatfelter's Claims for Damages in Excess of the Contract Amount will not be Stricken.[6]

Babcock next argues that Glatfelter's damages claims should be capped at the contract price of $11,705,601 because the limitation of liability clause within the contract dictates this result.  (Doc. 16, pp. 25–27.)  For its part, Glatfelter asserts that it is entitled to full recovery for all damages sought in the complaint because Babcock's repeated failure to remedy the shortcomings in its performance caused the contractual exclusive remedy provision to fail.  (Doc. 17, pp. 20–26.)  Babcock asserts that there was not one exclusive remedy provided for in the contract and that the limitation of liability clause otherwise accounted for this circumstance, providing that the "limitations will apply notwithstanding any failure of essential purpose of any limited remedy provided herein."  (Doc. 21, p. 22; Doc. 1-2, p. 25.)

---

[6] The court notes that a motion to strike "may not serve as an avenue to procure the dismissal of all or part of a complaint."  *Davila*, 979 F. Supp. 2d at 624, *vacated in part on reconsideration*, 2014 U.S. Dist. LEXIS 102143 (July 28, 2014) (citing *Giles*, 901 F. Supp. 2d at 530–31).  Since Babcock seeks partial dismissal of Glatfelter's damages claims, a motion to strike is the inappropriate avenue for this relief and will accordingly be denied.

The limitation of liability clause at issue provides as follows:

With the exception of damages arising from breach of confidentiality under Article 26, in no event shall a party be liable to the other party for any incidental, indirect, special, consequential, punitive or exemplary damages or loss of profits, non-operation or increased expense of operation, claims of the other party's customer, subcontractors, vendors or suppliers, loss of use of capital or revenue, or for fines or penalties assessed or levied against Glatfelter based on the operation, non-operation or use of the equipment arising out of, or in connection with, the agreement or any part thereof, whether or not advised of the possibility of such damage.

In no event shall Glatfelter's liability for any claim of negligence, strict liability or any other legal or equitable theory whatsoever arising out of or in connection with this agreement exceed the purchase price.

Except for claims of third parties for bodily injury, death, property damage or intellectual property infringement pursuant to [Babcock's] indemnity obligations in Article 28, **in no event shall [Babcock's] aggregate liability for any claim, whether arising out of tort (including negligence), strict liability or any other legal or equitable theory whatsoever, arising out of or in connection with this agreement exceed the purchase price.  The limitations will apply notwithstanding any failure of essential purpose of any limited remedy provided herein.**

(Doc. 1-2, p. 25) (emphasis added).

While Pennsylvania courts recognize that there is a difference between contracts which completely insulate a party from liability and those which merely place a limit upon that liability, no Pennsylvania cases have disfavored clauses which merely limit a party's liability.  *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 202 (3d Cir. 1995) (citing *DeFrancesco v. Western Pa. Water Co.*, 478 A.2d 1295, 1306 (Pa. Super. Ct. 1984)).  Indeed, the Third Circuit has found that:

Limitation of liability clauses are routinely enforced under the Uniform Commercial Code when contained in sales contracts negotiated between sophisticated parties and when no personal injury or property damage is involved. This is true whether the damages are pled in contract or tort. *See, e.g.*, *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 924 (Pa. Super. 1989) ("Under Pennsylvania law, contractual provisions . . . excluding liability for special, indirect and consequential damages are generally valid and enforceable."); 13 Pa. Cons. Stat. Ann. § 2719(c) (Purdons 1984) ("Limitation of consequential damages for injury to the person in the case of consumer goods is *prima facie* unconscionable but limitation of damages where the loss in commercial is not," and such limitation is enforceable [sic]). Such provisions have routinely been upheld in sales contracts of varying types. *See, e.g.*, *LoBianco v. Property Protection, Inc.*, 598 A.2d 52, 54 (Pa. Super. 1985) (clause limiting liability of security alarm company upheld against owner whose home was burglarized); *Wedner v. Fidelity Sec. Sys.*, 307 A.2d 429, 432 (Pa. Super. 1973) (alarm system installer's limitation of liability enforced against business operator); *Eimco Corp. v. Joseph Lombardi & Sons*, 162 A.2d 263, 266 (Pa. Super. 1960) (manufacturer's limitation of liability enforced against buyer-contractor); *Magar v. Lifetime*, 144 A.2d 747, 748 (Pa. Super. 1958) (alarm installer's limitation of liability enforced against private homeowner); *see also Posttape*, 537 F.2d at 755 (film manufacturer's limitation of liability enforced against producer); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146, 149 (3d Cir. 1974) (Manufacturer's limitation of liability upheld against buyer of used helicopters. "Freedom of contract should be permitted to allow a corporate purchaser to exercise its business judgment to forego claims for liability against the seller in exchange for a lower price."); *Shafer v. Reo Motors, Inc.*, 205 F.2d 685, 687–88 (3d Cir. 1953) (manufacturer's limitation of warranty enforced against buyer).

. . . .

We are persuaded that limitation of liability clauses are not disfavored under Pennsylvania law; especially when contained in contracts between informed business entities dealing at arm's length, and there has been no injury to person or property. . . . . Limitation of liability clauses are a way of allocating "unknown or undeterminable risks," *K*

> *& C, Inc. v. Westinghouse Elec. Corp.*, 263 A.2d 390, 393 (Pa. 1970),
> and are a fact of every-day business and commercial life.  So long as
> the limitation which is established is reasonable and not so drastic as to
> remove the incentive to perform with due care, Pennsylvania courts
> uphold the limitation.

*Id.* at 203–04; *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 262 (Pa. Super. Ct.

1997) ("Under Pennsylvania law, clauses limiting damages in commercial settings

are generally enforced.").  Thus, against this significant and long-standing

backdrop of Pennsylvania law, the court finds that the limitation of liability

provision at issue in this case is presumptively enforceable.

Glatfelter argues that the parties' contract contained an exclusive remedy

provision, which caused the contract to fail of its essential purpose.  Glatfelter thus

contends that this failure deprived it of the benefit of its bargain and should

therefore render the limitation of liability provision unenforceable.  The limited

remedy relied upon by Glatfelter appears in section 17 of the agreement and

provides that:

> [Babcock] shall promptly and at no charge to Glatfelter repair or re-
> perform any Work that does not meet the warranty in Article 16.  No
> remedy set forth in this Agreement (except to the extent specifically
> stated herein) is intended to be exclusive of any other remedy, and each
> remedy shall be in addition to every other remedy given hereunder, or
> now or hereafter existing at law, in equity, by statute, or otherwise. . . . .
> [Babcock] warrants against any defects in the Work and the Work's
> failure to conform with Article 16 (including Software) for a period of
> twelve (12) months following Acceptance as defined in Section 12, or
> two (2) years from delivery of the Work, whichever occurs first (the
> "<u>Warranty Period</u>").  If Work is not free from defects in material or
> workmanship and/or fails to comply with Article 16 during the

24

Warranty Period, [Babcock] shall, on Glatfelter's request and without delay, repair, replace, re-perform or modify at Glatfelter's option the defective Work so that such Work complies with the terms hereof.  If [Babcock] is unable to repair, modify or re-perform defective Work within the reasonable time required by Glatfelter, Glatfelter may itself or have a third-party replace defective Work or re-perform defective Work with work that is functionally equivalent to that set forth in the [Statement of Work] in which event [Babcock] will reimburse Glatfelter for any reasonable and actual costs incurred.  [Babcock's] foregoing warranties in Section 16 are exclusive and are given and accepted in lieu of any and all other warranties, express or implied, including without limitation, the implied warranties of merchantability and fitness for a particular purpose.  The remedies of Glatfelter **for any breach of warranty** shall be limited to those provided herein.

(*Id.* at 20) (bold emphasis added and removed).

Glatfelter's position is fundamentally flawed for a number of reasons. Initially, the limitation of liability provision explicitly states that "the limitations will apply notwithstanding any failure of essential purpose of any limited remedy provided herein."  (*Id.* at 25.)  Thus, the parties explicitly set forth their intent that liability be capped even in the event that a limited remedy failed of its essential purpose.  Even if this were not the case, the exclusive remedy provision cited by Glatfelter explicitly states that it applies to a breach of warranty, rather than the contract as a whole.  Thus, Glatfelter is not limited to the remedies contained within this provision for a contractual breach outside of Babcock's warranties.  The court notes that Glatfelter has not alleged breach of warranty claims in this lawsuit. Therefore, Glatfelter's reliance on this exclusive remedy provision for breach of warranty to invalidate the parties' limitation of liability clause is misplaced.

To the extent that Glatfelter attempts to argue that its cited provision is the exclusive remedy for the entire contract, this assertion is belied by the face of the contract.  It is evident that Glatfelter had numerous remedies built into the agreement, rather than one exclusive remedy.  For instance, in the event of Babcock's breach or default, Glatfelter "may, without prejudice to other remedies Glatfelter may have," correct such breach, and then deduct the reasonable costs to correct the breach from payments otherwise owed to Babcock.  (*Id.* at 5, 15.)  In addition, Glatfelter reserved the right to request that Babcock correct nonconforming work.  (*Id.*)  Glatfelter also reserved the right to withhold payment from Babcock "to such extent as may be necessary to protect itself from loss on account of" a variety of conditions, including, *inter alia*, defective work that has not been remedied, Babcock's failure to cure a breach of the agreement, or evidence of Babcock's financial insecurity that could jeopardize completion.  (*Id.* at 17–18.)  Glatfelter retained the right to terminate its agreement with Babcock, "in whole or in part for any reason whatsoever upon no less than thirty (30) days prior written notice."  (*Id.* at 22.)  This provision also set forth the process for dissolution of the parties' relationship and withdrawal from the contract in the event that Glatfelter was dissatisfied with Babcock's performance, or for any other reason.  (*Id.* at 22–23.)  Finally, Glatfelter also retained the right to bring suit in either the York County Court of Common Pleas or the Middle District of

Pennsylvania for "all claims and causes of action, whether in contract, tort, breach of warranty or otherwise[.]" (*Id.* at 27–28.) Thus, Glatfelter maintained numerous remedies throughout the course of the parties' agreement, and was not limited to an exclusive remedy in the event of Babcock's breach.[7]

Therefore, the court finds that the limitation of liability clause contained within the parties' contract is enforceable and is not undermined by an alleged failure of the essential purpose of the exclusive remedy provision for breach of Babcock's warranties. As a result, the damages that Glatfelter may recover in this lawsuit are subject to the cap anticipated in the parties' contract, the purchase price, in the event that the contract is found to be valid and enforceable.

However, the court makes two additional observations. First, the court notes that there has not yet been a determination made regarding the validity of the parties' contract in this case. Accordingly, the court finds that striking the claim for damages exceeding the contractual limitation would be premature at this stage.

---

[7] Glatfelter also appears to argue that the limitation on liability clause is unconscionable in light of the large gap between alleged actual versus recoverable damages. The court finds this argument unavailing. "In commercial settings, a limitation of damages clause will rarely be found unconscionable." *Borden, Inc.*, 701 A.2d at 264 (collecting cases). Moreover, a court will only find a contractual provision to be unconscionable if: "1) one of the parties had no meaningful choice with respect to the provision, and 2) the provision unreasonably favors the other party." *Id.* (collecting cases). Neither is the case here. Glatfelter has not alleged that it had no meaningful choice regarding the provision. Rather, this appears to be a transaction consisting of a "lengthy negotiations period" between sophisticated parties, both of whom had choice and some measure of control over the terms of their agreement. (Doc. 1, p. 9.) Likewise, the provision at issue applies with equal force to both parties, and therefore does not unreasonably favor one party over the other. For these reasons, the court finds that the provision is not unconscionable as a matter of law.

Second, the court notes that in the event that the contract is valid, the contract provides for increases and decreases in the purchase price in the event of delay or changes in the work to be performed.  (Doc. 1-2, pp. 12–13.)  It is unclear whether any agreed-upon alterations to the original purchase price occurred, but if they did, these changes could affect Glatfelter's overall damages cap.  In other words, Glatfelter could be entitled to recover more or less than the $11,705,601 original purchase price set forth in the contract if the contract is valid.  It is clear that the court has not been provided with the entire agreement between the parties, so the court will decline to set a damages cap at this time even in the event the contract is found to be valid.  Accordingly, the denial of Babcock's request to cap damages is without prejudice to renewal on a timely motion for summary judgment after discovery has been completed and the court has had an opportunity to fully consider the validity of the contract and any and all adjustments to the purchase price that would alter Glatfelter's contractual cap on damages in this case.

### D. Babcock & Wilcox Power Generation Group, Inc. will be Dismissed.

Finally, Babcock claims that Babcock & Wilcox Enterprises, Inc. should be dismissed from this case since it is the parent corporation of the signatory to the contract, and thus lacks involvement in the underlying claims in the complaint.  In support, Babcock proffers its legal name change form, executed on June 30, 2015, indicating that the signatory to the contract changed its legal designation from

"Babcock & Wilcox Power Generation Group, Inc." to "The Babcock & Wilcox Company."  (Doc. 16-1.)  Glatfelter has not disputed the accuracy or authenticity of this document.  Moreover, Glatfelter has not responded to Babcock's argument that Babcock & Wilcox Enterprises, Inc. should be dismissed from this lawsuit.

The court is not foreclosed from reviewing matters of public record in ruling on a motion to dismiss.  *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("Generally, in ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record.") (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  Indeed, courts have held that matters of public record include filings with the secretary of state.  *See, e.g.*, *Gentry v. Sikorsky Aircraft Corp.*, 383 F. Supp. 3d 442, 457 n.23 (E.D. Pa. 2019) (taking judicial notice of a public record from the Connecticut Secretary of State's website); *In re Spree.Com Corp.*, No. 01-0161, 2001 Bankr. LEXIS 1534, at *39–40 (E.D. Pa. Nov. 2, 2001) (taking judicial notice of an authenticated certificate from the Secretary of State of Delaware as a public record).  Thus, the court may take judicial notice of Babcock's submission from the Secretary of State of Delaware.  (Doc. 16-1.)  However, this document does not identify Babcock & Wilcox Enterprises, Inc. as the parent company of The Babcock & Wilcox Company.  Rather, it merely supports Babcock's assertion

that "Babcock & Wilcox Power Generation Group, Inc." changed its legal name to "The Babcock &Wilcox Company" in 2015.

The court therefore finds that "Babcock & Wilcox Power Generation Group, Inc." is an entity which no longer exists and should therefore be dismissed from this lawsuit. In contrast, the court has no support for the notion that "Babcock & Wilcox Enterprises, Inc." should be dismissed from this lawsuit aside from Babcock's assertion that this entity was not a signatory to the parties' contract and therefore has no involvement with the proceedings. Out of an abundance of caution, the court will decline to dismiss Babcock & Wilcox Enterprises, Inc. at this time. However, the court does so without prejudice to Babcock renewing its request at a later time or the parties' stipulating to a resolution of this issue.

## CONCLUSION

For the foregoing reasons, Defendant's motion to strike, Doc. 14, will be denied. In addition, Defendant's motion to dismiss, *id.*, will be granted in part and denied in part as follows:

1. Plaintiff's claims for fraud and negligent misrepresentation will be dismissed without prejudice to Plaintiff amending its complaint;

2. Plaintiff's claims for promissory estoppel and unjust enrichment will not be dismissed;

3. The court declines to make a determination regarding the enforceability and extent of a contractually-imposed cap regarding Plaintiff's damages claims before it has determined whether the parties' underlying contract is valid. However, in the event that the parties' contract is found to be valid, the court finds that Plaintiff's claims for damages will be limited by the terms of the parties' contract as explained in this memorandum; and

4. "Babcock & Wilcox Power Generation Group, Inc." will be dismissed from this case, but out of an abundance of caution, "Babcock & Wilcox Enterprises, Inc." will remain in this case. The parties may stipulate to whether this entity remains subject to this litigation, or Defendant may re-raise this issue at a later time once the parties have the benefit of discovery in this case.

An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: December 14, 2020