## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **P.H. GLATFELTER COMPANY,** | : | **Civil No. 1:19-CV-2215** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Judge Wilson)** |
| **BABCOCK & WILCOX POWER** | : | |
| **GENERATION GROUP, INC., f/k/a** | : | |
| **THE BABCOCK & WILCOX** | : | |
| **COMPANY, n/k/a BABCOCK &** | : | **(Magistrate Judge Carlson)** |
| **WILCOX ENTERPRISES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM AND ORDER

### I. Factual and Procedural Background

This case comes before us for resolution of a discovery dispute which is embodied in the correspondence of counsel, (Docs. 48, 50), which we will construe as a motion to compel a further interrogatory response. By way of background, Glatfelter, a global supplier of engineered materials headquartered in York, Pennsylvania, is suing Babcock in connection with a contract between these two companies to provide updated boilers for a Glatfelter facility in Spring Grove, Pennsylvania. According to Glatfelter's complaint, in the course of this project, Babcock provided materially deficient boilers, and made fraudulent and negligent misrepresentations regarding its workmanship, ability to fulfill the contract, and the

quality of the equipment which it provided to Glatfelter. (Doc. 1). On the basis of these factual averments, Glatfelter seeks damages in excess of $58,900,000. (Id., ¶ 92). According to the complaint, the matters alleged by Glatfelter regarding Babcock's deficient, negligent, and fraudulent performance on this project spanned from 2015 to 2018. (Id.) Moreover, Glatfelter describes the defective boilers provided by Babcock as a critical impediment to the operation of this facility. According to Glatfelter:

> 82. Despite years of attempts to correct its defective work, Babcock never provided the boilers it agreed to provide. To the contrary, Babcock's boilers have caused Glatfelter to experience years of uncertainty and unreliable performance, significant increased costs, and countless hours for troubleshooting and monitoring the boilers' performance for safety and deficiencies.
>
> 83. The Mill relies upon these boilers to operate. While the Mill is also supported by two other boiler systems (that do not run on natural gas), they are not capable of powering the Mill for any length of time on their own.

(Id., ¶¶ 82-83).

During this time frame when Glatfelter was operating this facility with these deficient boilers, which "caused Glatfelter to experience years of uncertainty and unreliable performance, significant increased costs, and countless hours for troubleshooting and monitoring the boilers' performance for safety and deficiencies," Glatfelter was also marketing its facility for sale. Eventually Glatfelter sold this facility in October of 2018 to Pixelle Specialty Solutions, LLC. (Id., ¶ 84).

It is against this backdrop that we consider the parties' positions regarding Babcock's Interrogatory 9, which asked Glatfelter to "Identify each Person involved in the marketing of the Facility or the sale of the Facility to [Pixelle], including a description of the Person's role and the party for whom such Person worked or provided services." While Glatfelter has provided some information regarding the actual sale of this facility, it has objected to disclosures relating to its marketing of this property, arguing that this information is both irrelevant and disproportionate to the needs of Babcock in defending this $58,900,000 lawsuit.

Upon consideration of the parties' positions, we find that this particular discovery is both relevant and proportionate. Therefore, for the reasons set forth below, we will order Glatfelter to fully comply with this interrogatory.

## II.   <u>Discussion</u>

Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion. <u>Marroquin-Manriquez v. I.N.S.</u>, 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. <u>See</u> <u>Farmers & Merchs.</u> <u>Nat'l Bank v. San Clemente Fin. Group Sec., Inc.</u>, 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a

discretionary [discovery] matter . . ., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)).   Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion."   Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

The exercise of this discretion is guided, however, by certain basic principles. At the outset, Rule 26(b) of the Federal Rules of Civil Procedure generally defines the scope of discovery permitted in a civil action, prescribes certain limits to that discovery and provides as follows:

(b) Discovery Scope and Limits.

(1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).

Thus, our discretion is limited in a number of significant ways by the scope of Rule 26 itself, which provides for discovery of only "nonprivileged matter that is relevant to any party's claim or defense." Therefore, "[t]he Court's discretion in ruling on discovery issues is, therefore, restricted to valid claims of relevance and privilege." Robinson v. Folino, No. 14-227, 2016 WL 4678340, at *2 (citing Jackson v. Beard, No. 11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("Although the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without its limits....Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information")).

Accordingly, at the outset it is clear that Rule 26's definition of that which can be obtained through discovery reaches any nonprivileged matter that is relevant to any party's claim or defense, and valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all relevant information, a concept which is not confined to admissible evidence but is also defined in the following terms: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Rather, Rule 26 states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." This concept of relevance is tempered, however, by

principles of proportionality. Thus we are now enjoined to also consider whether the specific discovery sought is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Thus, it has been said that the amended rule 'restores the proportionality factors to their original place in defining the scope of discovery.' " Fassett v. Sears Holdings Corp., 319 F.R.D. 143, 150 (M.D. Pa. 2017) (quoting Wertz v. GEA Heat Exchangers Inc., No. 1:14-CV-1991, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015)).

Viewing this discovery dispute as one that essentially entails an assessment of issues of relevance and proportionality, we find that the marketing information requested by Babcock is relevant to the claims and defenses in this case. Glatfelter has sued Babcock for $58,900,000 alleging breach of contract, fraud, negligent misrepresentations, and unjust enrichment, asserting that Babcock's failure to perform under this contract and misstatements regarding its performance "caused Glatfelter to experience years of uncertainty and unreliable performance, significant increased costs, and countless hours for troubleshooting and monitoring the boilers' performance for safety and deficiencies," (Doc. 1, ¶ 82). Given the allegations in this complaint, as framed by Glatfelter, the plaintiff's marketing statements regarding

the operation of the mill and the performance of these boilers during the time when Glatfelter alleges that the boilers were chronically deficient has obvious relevance to this case.

Indeed, these discovery disclosures may have a dual relevance here. If Glatfelter transparently disclosed to potential buyers that the boilers "caused Glatfelter to experience years of uncertainty and unreliable performance, significant increased costs, and countless hours for troubleshooting and monitoring the boilers' performance for safety and deficiencies," then this evidence would be highly relevant and strongly bolster the plaintiff's case. Conversely, if the marketing information provided to third parties describes the performance of the boilers in more positive terms, that information would be equally relevant but would carry a different evidentiary significance.

Finding that this information is relevant, we also conclude that the disclosure of this data is proportionate to the needs of the case. In making this determination, we are enjoined to "consider[] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b). By tying concepts of relevance and proportionality to the issues at stake in the case and the amount in controversy, "the Court looks

initially to the pleadings" to address these questions. F<u>assett v. Sears Holdings Corp.</u>, 319 F.R.D. 143, 149 (M.D. Pa. 2017). This means in a very real sense that it is often the plaintiff's complaint which defines both what is relevant and what is proportionate in discovery.

So it is here. Guided by the allegations in plaintiff's complaint, we find that the marketing representations made by Glatfelter at a time when the plaintiff alleges that the poor performance of the Babcock boilers "caused Glatfelter to experience years of uncertainty and unreliable performance, [and] significant increased costs," relate to an issue that Glatfelter has defined as a question of central importance to this case. Further, given Glatfelter's assertions that it has suffered injuries totaling $58,900,000 as a result of Babcock's actions, we also conclude that this discovery is proportional to the enormous amount in controversy.  Finally, we recognize that this information regarding Glatfelter's contemporaneous marketing efforts concerning the Spring Grove facility is information that is uniquely in the possession of the plaintiff, yet another factor which suggests that Babcock's demand for this information is both proper and proportional.

Finding that the discovery sought by Babcock is both relevant and proportional to the issues defined by Glatfelter in its complaint, we will order Glatfelter to fully respond to Interrogatory 9.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **P.H. GLATFELTER COMPANY,** | : | **Civil No. 1:19-CV-2215** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Judge Wilson)** |
| **BABCOCK & WILCOX POWER** | : | |
| **GENERATION GROUP, INC., f/k/a** | : | |
| **THE BABCOCK & WILCOX** | : | |
| **COMPANY, n/k/a BABCOCK &** | : | **(Magistrate Judge Carlson)** |
| **WILCOX ENTERPRISES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

AND NOW, this 4th day of August 2021, in accordance with the
accompanying Memorandum, IT IS ORDERED that the correspondence of counsel,
(Docs. 48, 50), which we will construe as a motion to compel further interrogatory
response to Defendant's Interrogatory 9, which asked Glatfelter to "Identify each
Person involved in the marketing of the Facility or the sale of the Facility to [Pixelle],
including a description of the Person's role and the party for whom such Person
worked or provided services" is GRANTED.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge